## SHEPARD S. S. CO. v. UNITED STATES.

### No. 280.

Circuit Court of Appeals, Second Circuit.

April 15, 1940.

turbine were damaged when the libellant's vessel in which they were installed was in collision with a vessel of the respondent and, if so, the amount of the recoverable damages.

The libellant's steamship Sage Brush was, on May 22, 1933, in collision with a ship of the respondent, the S. S. City of Rayville, off the Virginia Capes about twenty miles north of Chesapeake Light Vessel. The Sage Brush was a seaworthy steel cargo vessel of 5501 tons gross; 409.8 feet long; 54.2 feet beam; 27.7 depth of hold and equipped with a General Electric turbine of 2500 horsepower. The libellant had bought her of the Shipping Board in 1929 for the intercoastal trade in which she was engaged at the time. The City of Rayville was a steel freighter of about the same size.

When the collision occurred, the bow of the City of Rayville struck the starboard side of the Sage Brush just forward of the bridge at a point about one hundred feet forward of the engine room and cut in approximately eight feet. The No. 2 hold was punctured and filled with water to the water level. The starboard double bottom tanks were also pierced and sea water ran in to fill them. The starboard side bilge lines to No. 1 hold were broken and through them enough water ran into No. 1 hold to put the ship down by the head. She also had a starboard list. She made Newport News after the accident under her own power, however, and was there surveyed and repaired to the extent then found necessary to restore her to her seaworthy condition in the class she had before the collision. That was the highest classification given by the American Bureau of Shipping.

The power from her turbine rotor was transmitted through heavy gears to the drive shaft. The surveyors at Newport News recommended that these gears be opened up for examination; the clearances checked and then closed up in good order. Also that the holding down bolts for the main turbine, thrust and gear casings be tested and any loose or started bolts be made right. These recommendations were carried out. None of the surveyors, however, recommended that the alignment of the gears be checked and they were not tested in that respect. After the repairs at Newport News were made, the Sage Brush was there given a suitable dock trial in which the engines were run and the

Harold M. Kennedy, U. S. Atty., of Brooklyn, N. Y. (William E. Collins, Sp. Asst. to U. S. Atty., of New York City, of counsel), for appellant.

Burlingham, Veeder, Clark & Hupper, of New York City (Chauncey I. Clark and Eugene Underwood, both of New York City, of counsel), for appellee.

Before L. HAND, CHASE, and CLARK, Circuit Judges.

CHASE, Circuit Judge.

This appeal brings up for determination whether or not the reduction gears of a

gears operated without any trouble being noticed.

On May 31, 1933, she was sent to Hopewell, Va., and from there she went on June 2d to Philadelphia without any gear trouble. After loading a cargo, she proceeded on June 5th to Chester, Pa., and sailed thence on June 6th for San Pedro, Cal., where she arrived June 26th. When but a few days on that voyage, the gears began to sound a bit differently than they had before the collision and on June 25th the chief engineer heard a loud, unusual noise in the gear casing. When she reached San Pedro he opened the peep hole for the high speed pinion; that for the intermediate gear; also that for the low. speed gear, and made a visual inspection of the gears through those holes. He saw that several teeth were broken off the after helix of the port, intermediate gear but could see no other damage though he turned the engine enough to make possible an examination of the entire circumference of the gears.

On June 27th, while the ship was proceeding to San Francisco a somewhat different sound was made by the gears and on June 29th while the vessel lay at San Francisco another inspection of the gears was made like that at San Pedro. Their condition seemed to be the same though heavy wear on the high speed pinion was then noticed. The ship performed her engagements in California waters though unusual sounds were heard in the gear casing and was back in San Pedro on July 27th. She sailed for New York without any repairs to the gears which continued to operate with more or less disturbing noises until she arrived there on August 18th. Then a survey was made by the American Bureau of Shipping and three hundred and thirty teeth were found broken in the port and in the starboard intermediate gears. As the vessel had cargo for Boston, she was permitted to go there to discharge it and to return to New York where she was sent to Robbins Dry Dock and Repair Company for repairs on August 30th. There the gears having broken teeth were replaced with new ones and the vessel was again in seaworthy condition.

On May 27, 1933, the libellant filed its libel in the District Court for the Eastern District of New York and it was duly served upon the respondent which did not, however, file any answer. Instead, the parties entered into a stipulation to bear the total amount of the damages caused by the collision in the ratio of 80% by the respondent and 20% by the libellant with interest at 4% on all items of damage from the date of accrual and to bear the taxable costs in the same proportion. An interlocutory decree was accordingly entered and the cause was referred to a special master to find and report the amount of the damages caused by the collision. He did so and his report, confirmed by the court, was made the basis of the final decree from which the respondent has appealed.

The first, and principal issue, is whether or not the gear damage was in fact caused by the collision. This depends upon whether the inferences which have been drawn to the effect that the Sage Brush was then subjected to such strains and stresses that, though no teeth in the gears were then broken, the subsequent working of the ship caused the gear casing to spring and the gear bearings to become misaligned as much as several thousandths of an inch. Continued running of the gears thereafter subjected, so the libellant claims, their teeth to an uneven load they were not designed to carry and caused them to break as they did. The respondent agrees that, if there had been the misalignment of the bearings which the libellant claims there was, it would have been enough to cause the teeth to break in continued operation. So the factual problem becomes (1) whether it was fairly proved that the bearings were out of alignment while the gear teeth were breaking and (2) whether the misalignment was caused by the collision.

It was adequately proved that after the old gears were removed at New York; the bearings re-babbitted; and the new gears set in place the bearings were found to be out of alignment. True alignment was obtained by lowering the forward starboard bearing twenty-five thousandths of an inch. That opened the coupling between the starboard high speed gear and the starboard low speed pinion .015 which made it necessary to raise the after end of the gear casing .037. The respondent says with reason that the fact of such misalignment as was found when the new gears were installed does not necessarily mean that the bearings of the old gears were out of alignment. Yet it makes such misalignment of the old gear bearings extremely likely and that evidence taken in connection with the proved fact that

the gear teeth did break in the way they might have been expected to break in running with the bearings so misaligned makes the conclusion that they did break because of the uneven strain set up on them by the misalignment of the bearings by far the most reasonable one to make. That they did break as a misalignment of the bearings would have caused them to is shown by the undisputed evidence that the breaking was not fairly uniform throughout as would be expected if gears simply were wearing out under normal bearing conditions but that the breaks were largely in the corresponding parts of the teeth in the after helices. Such a restricted breakage area points to mechanical maladjustment instead of metal fatigue as the cause. And this conclusion is further supported by evidence of an analysis of the broken gear metal by an expert metallurgist which showed that the metal had not worn out to the breaking point. The evidence of the respondent falls short of counteracting this proof and we take the breaking of the old gears to have been caused by the misalignment of the old bearings as claimed by the libellant and found by the special master.

Whether this misalignment was proved to have been caused by the collision also depends upon what inferences should be drawn from the evidence. It is clear that even such a ramming as the Sage Brush received would not ordinarily be expected to spring the bearing casings of such gears as these about one hundred feet away unless there was more visible evidence of a twisting of the ship than there was at the time of the surveys at Newport News soon after the collision. Yet there was ample evidence from qualified witnesses to the effect that the collision might well have been the producing cause of the misalignment and that in their opinion it actually was. Such a conclusion seems to us to be the one that is most reasonable and that is supported by a preponderance of the evidence. We, therefore, accept the fact as found by the special master and approved by the court below that the misalignment and consequent gear damage was caused by the collision.

The appellant has called our attention to certain considerations to be kept in mind in deciding factual questions like these. One of them is that where the party charged with liability for the damage is not given notice of any survey of the alleged damage and no excuse for such failure is shown, the claim of damage is to be viewed with some suspicion. In that respect it is enough to say that no lack of notice here shown would reasonably lead to any belief that the libellant was ever trying to conceal any facts or that respondent was deprived of an opportunity to make reasonable inspection of the gears. But, however that may have been, such matters are only important as they serve as guides to decision as to the weight to be given the evidence relating to the facts in issue. Nor can it be said that the continued operation of the ship after her first arrival at San Pedro enhanced the damages. It was proved and found that the gears were then in such condition that adequate repair required replacement.

Finally, we are urged to modify the decree to allow recovery only on the basis of one half the gear damage because old gears were replaced with new and the libellant, who was admittedly partly at fault for the collision, has been unjustly benefited to the extent that the new gears were worth more than the old. In the light of the stipulation which shows the agreement of the parties to bear the collision damages in the proportion stated without any reservation in respect to an allowance for any increase in the value of new parts over the old replaced or of any modification, except as to the proportion in which they were to be borne, of the usual rule of division of damages in admiralty where both parties are at fault, we must apply the established rule as to damages. Generally speaking it is restitutio in integrum. Standard Oil Co. v. Southern Pacific Co., 268 U.S. 146, 45 S.Ct. 465, 69 L.Ed. 890. But where repairs are made which require the installation of new parts in a vessel to restore her to the condition in which she was before a collision for which another is responsible, the party liable cannot be given credit for the difference between the value of the ship necessarily so repaired and what its value would have been had the old, but still good parts, which the collision made unsuitable for continued use, been undamaged. The Baltimore, 8 Wall. 377, 19 L.Ed. 463; Navigazione Libera T. S. A. v. Newton Creek Towing Co., 2 Cir., 98 F.2d 694. However much might be said logically to the contrary, the law of damages as applied below is now to be taken as established in a situation like the collision here involved.

It is not to be confused with any special usage in insurance cases or with situations where the part replaced was not in good condition at the time of the accident.

Affirmed.