GALLAGHER BROS. SAND & GRAVEL CORPORATION v. ANTHONY O'BOYLE, Inc. et al.

THE SEABOARD NO. 9.

No. A–18330.

United States District Court E. D. New York.

Jan. 4, 1951.

Foley & Martin, New York City, (Christopher E. Heckman, New York City, of counsel), for libellant.

Macklin, Speer, Hanan & McKernan, New York City, (Leo F. Hanan, New York City, of counsel), for Anthony O'Boyle, Inc., respondent.

Cohen & McGuirk, New York City, (Francis M. Greene, New York City, of counsel), for The Barrett Company, Inc.,

BYERS, District Judge.

The libellant's scow Seaboard #9 was in good condition on November 22, 1946, when she passed under the usual harbor charter to respondent O'Boyle, and she was returned in damaged condition on December 16, 1946. So much is not in dispute.

During that interval she was taken into custody and control by The Barrett Company, Inc., the impleaded-respondent, pursuant to arrangements made by it with O'Boyle, and the real controversy is as to her legal status for that period of time, and whether that party deemed to be the actual charterer has gone forward with proof sufficient to meet the requirements of libellant's prima facie case, the establishment of which was stipulated.

It should be said that the damage consisted of broken deck stringers, planks and rails about two-thirds of the length of the scow aft of the bow. There was a depression in the deck about three feet in diameter and about one and a half inches deep; there was no mark, fracture, or abrasion on the deck such as is customarily present when the damage is due to striking by a bucket or other heavy object.

A survey was held on December 20, 1946, of which no notice was given to Barrett, and naturally the latter was not represented.

The libel was filed March 18, 1947, the answer of respondent on August 13, 1947, and on the same day also the impleading petition. That apparently was the first notice to Barrett of the damage. At least there is nothing to show prior notice of claim against that company.

Barrett, among other things, operated a plant in Edgewater, N. J., at which pitch is produced, and transported via rail to a loading device called a coal tipple, on a dock also in Edgewater; the cars are there raised some 25 feet to the level of a pan, into which the pitch is turned as is done with coal. That load moves by gravity through a telescopic chute attached to the pan, into a ship, scow or other vessel for haulage by water.

The pitch is not thus handled until it has hardened into cakes and slabs, which on occasion are of such dimensions that

they have to be broken into smaller bulk for manipulation.

It was to transfer some 491 long tons of such pitch from the said coal tipple, to the S. S. Caen lying at General Chemical dock, also at Edgewater, that Barrett obtained the use of the Seaboard #9. The arrangement was made by telephone call from Milton Prendeville, employed by and acting for Barrett, to Craig acting for O'Boyle. Thus the former:

"I called O'Boyle * * *, Mr. Craig, and told him I would need a certain amount of barges on a certain date, and he would take it from there.

"Q. That is the entire conversation that you had with Mr. Craig of O'Boyle with respect to these barges, is that correct? A. That is right.

"Q. What, if anything, did you do with respect to obtaining labor? A. I did nothing whatsoever.

"Q. You had nothing to do with that? A. No, sir."

The foregoing being Barrett testimony is sufficient to demonstrate, in my opinion, that several scows, including Seaboard #9, were hired by Barrett from O'-Boyle (Zeller Marine was the broker), in a separate contract from that referred to in O'Boyle Ex. D, which had to do with labor and equipment for loading the pitch from lighters into the S. S. Caen. A finding to that effect is hereby made.

Also, in default of evidence of a different understanding, what was contemplated by the parties and what went into effect as to Seaboard #9 was the customary harbor charter of a scow having her own scow-master aboard. It is found that such was the relationship between O'Boyle and Barrett from November 22, 1946, to December 16, 1946, both dates inclusive.

The reasons for this finding are (a) the testimony above quoted, (b) the fact that the scows were billed separately by O'Boyle to Barrett as "scow expense" (O'Boyle Ex.B), at a cost basis, i.e., O'Boyle charged Barrett the exact sum ($22.00 per day) for the scows that it paid to libellant through Zeller Marine, while its contract for labor and equipment (i.e., O'Boyle No. 3 steam-

crane and the work of trimming to be explained) was billed and paid for on a basis of cost plus 10% (O'Boyle Ex.E).

Incidentally, the discrepancy of 4 days between November 22 and November 26 as shown in O'Boyle Ex.B. has been disregarded in light of the testimony.

(c) The fact that Barrett did the towing of this scow first to the coal dock or tipple, and thence to the floating crane alongside the Caen. The distances involved, dates and movements have not been disclosed, but that is not the only respect in which the testimony as a whole is sparse and fragile.

The inclusion of the word "towing" in O'Boyle Ex.C entitled "Purchase Order B 16279" of December 26, 1946, on a Barrett form, is without present significance since the testimony shows that the towing was not done by O'Boyle, hence this "Purchase Order" is mistaken in substance; also it is quite inappropriate in form for such a transaction as this and was probably used as a measure of economy in accounting procedures of the Barrett Company; it is manifestly intended to cover purchases of merchandise; finally, it bears a date 10 days later than the expiration of the period under which the scow was under charter to Barrett, by which time the legal relations of the parties were beyond the influence of ex post facto accounting classification.

Barrett took possession of Seaboard #9 on November 22, 1946, according to the uncontradicted testimony of Craig for O'Boyle, at 30th Street, East River, and that custody continued until her cargo of pitch had been discharged into the Caen, which was completed on December 16th, but her whereabouts and handling between those dates are unexplained in the Barrett case. True, the method presumably followed in putting the pitch aboard is described in the testimony of Donald, the general foreman of the railroad dock, who had no recollection of this operation and could say only that his employer's records disclose no entry of damage to this scow "on that date" (p. 96) "I can't say the exact dates, but I know there hadn't been any damage. We didn't look for every particular barge,

we looked for only the boats that were loaded that day, and we found out there were no reports."

He had scanned his records the day before he testified (October 25, 1950) and his attention had not been previously directed to the entire subject, which explains his confusion as to dates. It is assumed that the Seaboard #9 was loaded at this place during the period here involved, and that the records to which he referred were negative, but otherwise his testimony is not informative.

It has been said that the surveyor stated that the damaged area on deck did not show signs of the impact there of a heavy object; if that were to be credited in spite of its ex parte character, it should be remembered also that the operator of the loading equipment at the coal tipple (not called as a witness) might not have been aware of any happening on the scow which indeed caused damage, after the deck itself had been covered with the broken pitch, which would be consistent with the absence of any report of observable damage. Conjecture is quite unsatisfactory in the absence of any understanding of the field of observation open to the operator of the discharging equipment.

The scow was towed alongside the steam-crane O'Boyle #3, which in turn was made fast alongside the S. S. Caen, on December 14, 1946, and the pitch was removed from the scow and delivered on the ship by the operation of a bucket swung from a gooseneck crane on the O'Boyle #3, the pitch being taken into the bucket, which opened to receive and closed to hold, a 2½ cubic yard load. Then the crane swung the loaded bucket over the side of the ship, and the contents were there delivered as required.

The bucket is about 4 feet deep and about 4–4½ feet wide and when empty weighs about 4 tons.

This cargo of pitch was frozen on arrival alongside the O'Boyle #3, and had to be loosened by the use of picks and axes by the trimmers charged for in the bill part of O'Boyle Ex.E, rendered to and paid for by Barrett.

That is the subject-matter of the separate contract to which reference has been made. Clark, the engineer of the crane, explained its operation on December 14th (Saturday) and 16th. He said that before the trimmers arrived he took off what he "could get of the light stuff on top, * * but down in the bottom of the boat I guess there were lumps there weighing 50 tons. They were the ones that had to be broken up. You couldn't handle them unless you chained them up." (i.e. made a sling of a cable or chain)

Further, that he did not use the bucket to break up the large lumps of pitch, and that the bucket did not hit the deck of the scow in securing a load, i.e., getting the lip of the bucket under an edge of frozen pitch which had been broken up by the trimmers. He said also that he heard of no claim of damage to the scow until a few days later (after the 16th) when the O'Boyle foreman Wilson spoke to him about it. Nothing in Clark's demeanor as a witness suggested a reason to discredit his testimony. Incidentally, Wilson was not available to testify, by reason of his physical condition at the time of trial.

Also Clark said that he observed none of the damage to the scow which has been related, and that he could see the deck from his position on the crane. Since, however, the work was completed on December 16th at 5:00 P.M., five days prior to the shortest day of the year, and there is no showing as to the use of lights after 4:00 P.M. on the scow in the completion of the job, this statement cannot be viewed as testimony to the effect that the damage was not then present on the scow.

There has been no attempt in the Barrett case to trace the handling or movements of the vessel from November 22nd, when she was first taken in tow, for the ensuing period of three weeks, or until her arrival alongside the steam-crane on December 14th, again in tow of a Barrett tug. This reticence is highly significant.

[2] There is on file (December 30, 1948) libellant's answer to impleaded-respondent's interrogatory #13, giving the name and address of the scow-master of Seaboard #9. The failure to call him as a

witness leaves the case barren of any information whatever as to the doings and movements of the scow for the entire period during which the Barrett Company is deemed to have held the vessel under charter; it is hereby found that the latter has failed to go forward with any evidence at all from which it could be fairly inferred that the damage in question was not the result of any act or omission of the Barrett Company as charterer.

 The only deterrent to the decree which seems plainly to be required is the failure of respondent to give notice of the survey to Barrett. The survey is in evidence to the extent of showing the condition existing on December 20th, as stated by the surveyor, on the concession that damage of some kind was then present, but its precise nature and extent are not deemed to have been established. That subject is appropriate for consideration by a commissioner to assess damages.

On the general subject of the effect of failure to give notice of survey, the following have been consulted: The Mason, 2 Cir., 249 F. 718; The Westchester, 2 Cir., 254 F. 576; Pennsylvania R. Co. v. Downer Towing Corporation et al., 11 F.2d 466; Cities Service Kansas v. Hartol Products Corp., 1936 A.M.C. 1703; Shepard S. S. Co. v. United States, 2 Cir., 111 F.2d 110 at page 113.

In the light of the foregoing, it is concluded that O'Boyle's failure to give notice of survey to Barrett is some evidence that the latter's possible culpability was not apprehended by the respondent promptly upon the Seaboard #9's going off charter on December 16, 1946. This is a circumstance tending to dilute the respondent's asserted cause, but not to the vanishing point as I believe.

Even in its attenuated aspect the case for the respondent is more persuasive than that for the impleaded-respondent, which is devoid of any affirmative showing whatever which would constitute going forward with proof of giving such care and attention to the Seaboard #9 as would be consistent with the obligations imposed by the harbor charter, the creation of which has been found.

The argument has not been overlooked that no showing has been made that the damage did not occur between December 16th and December 20th when the survey was held. The stipulation was that the respondent O'Boyle conceded the damaged condition on December 16th, and the impleaded-respondent had no evidence to the contrary. Since the latter was responsible as charterer through that day, it seems to follow that, under the record as made, the incidence of damage cannot be assigned to a date beyond the 16th covered by respondent's bill to Barrett, O'Boyle Ex. B, and which is not inconsistent, as to this date, with Barrett's so-called "Purchase Order" B 16279, O'Boyle Ex.C.

It results that the libellant is entitled to the usual interlocutory decree, without costs, as against the impleaded-respondent primarily, and the respondent secondarily, to be settled. Costs are withheld in view of libellant's case being stipulated rather than proved.

If findings in addition to those herein stated are desired, they may be submitted for consideration and possible settlement on notice.