**BERISFORD METALS CORPORATION,**
Plaintiff-Appellant-Cross-Appellee,

v.

**S/S SALVADOR, her engines, boilers, etc., and A/S IVARANS REDERI, Defendants-Appellees, Cross-Appellants.**

Nos. 91, 195, Dockets 85–7401, 85–7429.

United States Court of Appeals, Second Circuit.

Argued Sept. 30, 1985.

Decided Dec. 16, 1985.

John P. Conroy, New York City (Douglas A. Franklin, McHugh & O'Conor, New York City, of counsel), for Berisford Metals Corp.

Chester D. Hooper, New York City (Ara A. Shimshidian, Haight, Gardner, Poor &

Havens, New York, City, of counsel), for S/S Salvador and A/S Ivarans Rederi.

Before FRIENDLY, MANSFIELD and WINTER, Circuit Judges.

MANSFIELD, Circuit Judge.

Berisford Metals Corporation (Berisford), plaintiff in this cargo-loss action, appeals from an order and judgment of the Southern District of New York, Gerard L. Goettel, Judge, granting its motion for summary judgment against the ship S/S Salvador and A/S Ivarans Rederi (Ivarans), its owner and operator, for loss of 70 bundles of tin ingots valued at $483,214.90 but applying the limitation of liability provision of § 4(5) of the Carriage of Goods by Sea Act, 46 U.S.C. § 1304(5)[1] (COGSA), to limit the defendants' liability to $500 per bundle, or a total of $35,000. Defendants cross-appeal from the district court's denial of their motion for dismissal of the action. We reverse the judgment to the extent that it limits defendants' liability to $500 per bundle and remand the case with directions to enter judgment in Berisford's favor for the full value of the lost cargo. We affirm the district court's denial of defendants' motion to dismiss the complaint.

The material facts are not in dispute. On June 23, 1983, Berisford contracted to purchase from Paranapanema International Ltd. (Paranapanema), located in Sao Paolo, Brazil, 50 metric tons of grade A tin ingots in bundles at a price of $13,140 per metric ton (a price later changed by the parties of $13,300 per metric ton). The terms were F.O.B. vessel at Santos, Brazil, for shipment to New York in January 1984.[2] Payment was to be made net cash

---

1. Section 4(5) of COGSA, 46 U.S.C. § 1304(5) provides:

"Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per package lawful money of the United States, or in case of goods not shipped in packages, per customary freight unit, or the equivalent of that sum in other currency, unless the nature and value of such goods have been declared by the shipper before shipment

and inserted in the bill of lading. This declaration, if embodied in the bill of lading, shall be prima facie evidence, but shall not be conclusive on the carrier."

2. F.O.B. or Free on Board "means that title to property passes from the seller to buyer at the designated FOB point." 10 *Williston on Contracts*, § 1079A, at 94 n. 6 (3d ed. 1967). Since the vessel was designated as the FOB point in this case title to the goods was to pass when the goods were loaded on board the ship. *See id.,*

45 days after ocean bill of lading date against presentation of a "full set of shipping documents," which, in conjunction with the F.O.B. vessel term, was understood by the parties as requiring a clean on board bill of lading.

Pursuant to the contract Paranapanema delivered 100 bundles, each containing 30 tin ingots and steel-strapped onto wooden pallets, to Ivarans' agent at Santos, Agencia de Vapores Grieg, S.A. (Grieg), which maintains a terminal located about 5 kilometers from the dock where cargo would be loaded onto Ivarans' ship. Grieg acknowledged receipt of the bundles on December 29, 1983. Grieg stuffed the 100 bundles into four 20-foot containers at its terminal, as follows:

Container No. NICU 901692 35 bundles
Container No. NICU 703002 35 bundles
Container No. IVLU 904540 9 bundles
Container No. IVLU 902420 21 bundles

The containerization was carried out "at ship's convenience", to which Berisford did not object. Clause 6 of the bill of lading later issued by Ivarans authorized the carrier to stow goods "as received or, at Carrier's option, by means of containers or similar articles of transport used to consolidate goods".

After stuffing of each container its doors were closed, locked and sealed. On January 3, 1984, the containers were transported by Grieg to a Brazilian government-controlled storage yard located near the loading dock. Upon delivery of the containers to that yard they appeared, from the sound and handling of the trucks used to transport them, to be loaded, not empty. The government storage yard issued receipts indicating weights approximately equaling those listed on the shipping documents. At that point the seals and locks appeared unchanged.

On January 4, 1984, the containers were removed from the yard and loaded by stevedores aboard the vessel. On the same date Grieg, acting on behalf of Ivarans and the Master of the S/S Salvador, issued a clean on board bill of lading stating that the ship had received "100 bundles steel strapped on wooden skids containing 3000 refined tin ingots, 'Mamore' brand, with a minimum purity of 99.9%". The gross weight was stated on the bill to be "50,647" kilos and the net weight as "49,845" kilos. Par. 3 of the conditions on the back side of the bill of lading provided that the provisions of COGSA would apply throughout "the entire time the goods [would be] in the carrier's custody, including the period of carrier's custody before loading on and after discharge from the ship". The bill further stated that unless a higher value had been declared in writing prior to delivery and inserted in the bill, the $500 limit per package specified by COGSA would govern the carrier's liability. *See* note 1, *supra.*

Upon the loading of the four containers aboard the ship, neither Ivarans nor its agent Grieg verified the contents or made a tally of the 100 bundles represented by the bill of lading to be in the containers. After being loaded aboard the ship, the containers were not shifted from their place of stowage until the ship arrived in New York on January 19, 1984, at the Red Hook Terminal in Brooklyn. There the four containers were discharged on January 20, 1984, and placed on the ground outside Pier 11 to await stripping. On January 24, 1984, Universal Maritime Services, Ivarans' stevedore, opened the four containers by using a bolt cutter or pliers to cut the seals and found that two of them supposed to contain 70 bundles were empty. Before being broken the seals of the containers appeared to be intact, with no evidence of tampering; in fact, the seals were pitted and rusted. Neither the floors of the two containers nor the snow-covered ground around them near Pier 11 revealed any evidence of recent removal of any cargo from the containers. Each bundle would have weighed approximately 1100 lbs.

On January 27, 1984, Berisford wrote U.S. Navigation, Ivarans' New York agent, charging Ivarans with responsibility for the loss of the 70 bundles. On February

§ 1080A, at 109–10 (Standard American Foreign Trade Definitions).

7th Mr. K.W. Hansen, a marine surveyor retained by U.S. Navigation to investigate the loss, rendered a written report which stated that in his opinion the "70 missing bundles of tin ingots were never loaded in the two containers."

In the meantime the Mellon Bank in New York, representing Paranapanema, the seller and shipper of the tin ingots, presented to Berisford in accordance with the purchase contract a full set of shipping documents with respect to the 100 bundles of tin ingots purchased by Berisford, including three original on board bills of lading issued by the carrier (Ivarans), Paranapanema's invoice, weight and analysis certificates, and a draft in the amount of $662,938.50, payable 45 days after the bill of lading date. Since the papers were in order and complied with the parties' purchase contract Berisford accepted the draft and on February 17, 1984, paid the full amount of the purchase price to the Mellon Bank as collection agent for Paranapanema. In addition, Berisford paid Ivarans' freight charges amounting to $10,101.67.

On August 31, 1984, Berisford commenced the present action, seeking $525,-000 damages for the missing cargo. Defendants' answer admitted receipt of the shipment of bundles of tin ingots but denied liability, asserting its rights under COGSA and its bill of lading with respect to the shipment, including COGSA's $500 per package limitation on its liability, and alleging that it acted without any fault or neglect. On February 5, 1985, after the parties had conducted pre-trial discovery, including the taking of depositions,[3] Berisford moved for summary judgment, contending that it had paid the purchase price in reliance on Ivarans' representation in its on board bill of lading that the 70 missing bundles had been loaded aboard its ship, that it was committed by its purchase contract to pay the purchase price upon the seller's presentation of the shipping documents, and that the defendant carrier's

issuance of a clean on board bill of lading when in fact the ship had not received the 70 bundles constituted a "quasi-deviation," depriving the carrier of the benefits of the bill of lading, including its per package limitation on liability. Berisford sought damages in the amount of $483,214.90 plus interest.

Ivarans did not seriously question the probability that the loss of the 70 bundles occurred prior to its loading of the containers aboard its ship in Santos. Indeed, the evidence that the two containers had not been opened after loading and prior to their being found empty upon their arrival in New York (while still in Ivarans' custody) was overwhelming. Ivarans offered no evidence to the contrary. Its principal defenses were (1) that it could not be faulted for any pilferage that may have occurred while the goods were in the custody of the Brazilian government-controlled dockside warehouse in Santos since it had no control over that warehouse or the government's longshoremen, (2) that Berisford's loss was not caused by its misdescription of the contents of the containers because Ivarans was not required, under the purchase contract's provision for payment against a "full set of shipping documents," to issue an on board bill of lading, and (3) that in any event defendants' liability was limited to $500 per bundle. In opposing plaintiff's motion the defendants, in an affidavit of their attorney, Chester D. Hooper, asked that the complaint be dismissed or in the alternative that Ivarans' liability be limited to $500 per bundle.

In an oral bench opinion Judge Goettel concluded that an evidentiary hearing was unnecessary since the existing evidence demonstrated that the loss had occurred while the cargo was in the possession of the Brazilian government's stevedores in Santos. He rejected Ivarans' argument that it was not responsible for a loss occurring while the cargo was in the possession of the Brazilian Government. However, he

---

3. The persons deposed included Paul W. Schaldonat, Berisford's Vice President; Ingeman Johansen, captain of the S/S Salvador; and Peter J. Rainone, employee of McRoberts Protective Agency, who was in charge of security at Pier 11, Red Hook Terminal, Brooklyn.

also rejected Berisford's contention that Ivarans' issuance of a false on board bill of lading constituted a "quasi deviation" negating the availability of the COGSA per package limitation on liability. Instead, he held that a carrier is estopped from denying that the goods were loaded only upon a showing that it knew that they had not been loaded. He accordingly granted plaintiff's motion to the extent of awarding it judgment in the sum of $35,000, from which both parties appeal.

## DISCUSSION

The central question raised by this appeal is whether a carrier that issues a clean on board bill of lading erroneously stating that certain goods have been received on board when they have not been so loaded should be precluded from limiting its liability pursuant to an agreement binding the parties to the terms of § 4(5) of COGSA, 46 U.S.C. § 1304(5). For the purpose of resolving this issue a brief review of pertinent admiralty law principles is helpful.

As we recently reaffirmed in *Allied Chemical International Corp. v. Companhia de Navegacao Lloyd Brasileiro*, 775 F.2d 476, 478, 481–82 (1985), a negotiable or order bill of lading is a fundamental and vital pillar of international trade and commerce, indispensable to the conduct and financing of business involving the sale and transportation of goods between parties located at a distance from one another. It constitutes an acknowledgement by a carrier that it has received the described goods for shipment. It is also a contract of carriage. As a document of title it controls the possession of the goods themselves. *See Gilmore and Black, The Law of Admiralty*, Ch. III, § 3–1, p. 93 (2d ed. 1975). It has been said that the bill and the goods become one and the same, with the goods being "locked up in the bill." *Id.* 96. As the court stated in *Pollard v. Reardon*, 65 F. 848, 852 (1st Cir.1895),

"In the developments of commerce and commercial credits the bill of lading has come to represent the property, but with greater facility of negotiation, transfer, and delivery than the property itself.... And it has become so universal and necessary a factor in mercantile credits that the law should make good what the bill of lading thus holds out. There is every reason found in the law of equitable estoppel and in sound public policy for holding, and no injustice is involved in holding, that, if one of two must suffer, it should be he who voluntarily puts out of his hands an assignable bill of lading, rather than he who innocently advances value thereon."

The necessity for maintaining the integrity of and confidence in bills of lading has been recognized by us in a line of cases beginning before and continuing after the 1936 enactment of COGSA. In *Higgins v. Anglo-Algerian Steamship Co.*, 248 F. 386 (2d Cir.1918), for instance, after reviewing decisions of English courts on the question we held that a carrier which issued a clean bill of lading falsely representing that it received goods in apparent good order and condition when it knew they were damaged may not take advantage of exceptions and limitations in the bill for its own benefit.

The carrier's responsibility for issuance of false bills of lading was thoroughly considered by this court in *Olivier Straw Goods Corporation v. Osaka Shosen Kaisha*, which was the subject of two appeals over a period of four years, 27 F.2d 129 (2d Cir.1928) (*Olivier I*), aff'd after remand, 47 F.2d 878 (2d Cir.), (*Olivier II*), cert. denied, 283 U.S. 856, 51 S.Ct. 648, 75 L.Ed. 1462 (1931). In that case, which was remarkably similar to the present one, the shipper delivered 18 cases of hemp to the carrier at its Yokohama dock for shipment by steamer to New York. The carrier issued and delivered to the shipper a bill of lading representing that the cases had been loaded on the ship Alaska Maru when in fact they had not been loaded because that ship had been diverted elsewhere due to an earthquake. The cases of hemp, which had been placed by the carrier in an unprotected dockside shed, were lost as a result of looting. Relying on the bill of lading and

other shipping papers forwarded to it by the shipper, the purchaser's bank accepted and paid the shipper's invoice. The purchaser then sued the carrier for the value of the hemp. In an opinion by Judge Augustus Hand, concurred in by Judges Learned Hand and Swan, the court held the carrier liable for the full value of the goods described in the bill of lading, stating:

"The bill of lading recited that the goods were shipped in apparent good order and condition. That statement was a warranty that they were so shipped, and the libelant, as indorsee of the bill of lading, acquired the direct obligation of the carrier and with it the right to sue....

"The warranty that the goods were on board was broken by the failure to ship them, and that breach ... deprived the carrier of the right to invoke the clauses limiting liability. In *The Sarnia*, 278 F. 459 [1921], where the cargo had been improperly stowed on deck, we held that the valuation clauses in the bill of lading did not serve to limit damages. We said, at page 461 of 278 F.: 'The general rule undoubtedly is that, if the shipowner commits a breach of the contract of affreightment which goes to the essence of the contract, he is not entitled after such breach to invoke the provisions of the contract which are in his favor.'

\* \* \* \* \* \*

"Certainly a breach like the one here, which arose from a failure to ship the cargo at all, with its consequent loss or destruction on land, was no less fundamental than a deviation in the voyage, or than stowage of cargo on deck contrary to agreement, or than misdelivery of goods. In all such circumstances valuation clauses in the bill of lading have been held inoperative to relieve the shipowner. *St. Johns N.F. Shipping Corporation v. S.A. Companhia Geral, etc.*, 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 [1923]; *The Cabo Villano* (C.C.A.) 18 F.(2d) 220 [1927]; *Niles-Bement-Pond Co. v. Dampkiesaktieselskabet Balto* (C.C.A.) 282 F. 235 [1922]; *The Sarnia* (C.C.A.) 278 F. 459 [1921]." *Olivier II, supra*, at 879–80.

Although we have declined to extend full liability in some contexts that have been likened to deviations or "quasi-deviations" in a voyage, *see Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68, 71–72 (2d Cir.1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975); *Encyclopaedia Britannica, Inc. v. S.S. Hong Kong Producer*, 422 F.2d 7, 19 (2d Cir.1969) (Hays, J., dissenting), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970), we have steadfastly adhered to the result reached in *Olivier II* and have cited the case with approval for the proposition that the $500 per package limitation of liability may not be invoked by a carrier that has issued an on board bill of lading erroneously representing that goods were loaded aboard its ship, regardless whether or not the carrier acted fraudulently. *Elgie & Co. v. S.S. "S.A. Nederburg"*, 599 F.2d 1177, 1181 (2d Cir.1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980). It is true that *Elgie & Co.* involved a shipment from the United States governed by the Pomerene Act, 49 U.S.C. § 81 *et seq.*, which does not contain limitation of liability provisions. However, the court took pains to point out that it did not base its holding on that distinction but on what it conceived to be "established doctrines of admiralty law", citing *Olivier II*. Similarly we recognized that it was "the common law rule" that such a fundamental misstatement in a bill of lading need not be fraudulent or intentional for liability to ensue. 599 F.2d at 1180.

The *Olivier II* ruling represents just as sound public policy today as it did in 1931. Whether one likens the carrier's issuance of a false bill of lading with respect to its loading of cargo to a "deviation," a "breach of warranty" or a representation which it must be "estopped" to deny, its adverse impact on trade and on reliance on bills as an essential method of facilitating trade is serious. Title to the goods usually passes from the seller to the buyer when the seller delivers the goods to the carrier

and the carrier or its agent issues a bill. In the past, on board bills, signifying that the goods had been loaded on board the ship, were generally required. More recently, "received for shipment" bills, which indicate merely that the carrier has received the goods, are sometimes used. *See* 10 *Williston, supra,* at § 1078A, pp. 83–87. In this case, an on board bill was clearly required by the parties. When the proper bill issues, the seller then ceases to assume any risk of loss or damage. The carrier, by issuing the bill, enables the seller to collect full payment of the purchase price from the buyer since presentation of the bill to the buyer assures it that the seller has fulfilled its commitment to ship the goods and obligates the buyer to pay for them. Presentation of an on board bill also serves to satisfy the buyer that the goods have not been stolen or lost while in the custody of the carrier prior to loading, an interval during which the seller bears the risk of any loss in any transaction requiring such a bill. If, instead, the buyer were free to question the accuracy of the bill upon presentation, the entire structure would be weakened as a method of carrying out commercial transactions.

■ In support of their contention that a carrier may be held liable for a misstatement in its bill of lading only if it acted intentionally or fraudulently, defendants direct our attention to decisions holding that when a carrier issues a bill of lading to the effect that it has received goods in apparent good condition it may not be held liable beyond a per package limitation for damaged goods contained in the bill of lading or COGSA unless it had actual knowledge of the damaged condition at the time of loading or the damage was readily apparent at that time. *See The Carso,* 53 F.2d 374 (2d Cir.1931); *American Industries Corp. v. M.V. Margarite,* 556 F.Supp. 206, 212–13 (S.D.N.Y.1981). These "conditions" cases are readily distinguishable from those applying *Olivier II.* The "conditions" cases raise the issue of the extent to which a carrier must inspect the condition of goods made, sold and bought by others. Since the imposition of a duty to make a

detailed inspection of the condition of the contents of every package received from others would be excessive, the carrier may be held liable only if it knew or could readily see that the packages were not in good condition. A carrier is not required to open every package received from a shipper and inspect the contents before issuing a bill to the effect that they appear to be in good condition.

■ When a carrier, on the other hand, makes a representation in a bill of lading with respect to *its own conduct* it is properly held to a higher standard since it is reasonably expected to be aware of *its own actions,* including whether or not it has loaded cargo, *Olivier II, supra; Miles Metal Corp. v. M.S. Havjo,* 494 F.2d 563 (2d Cir.1974), or has loaded the cargo below or above decks. *See St. Johns N.F. Shipping Corporation v. S.A. Companhia Geral,* 263 U.S. 119, 44 S.Ct. 30, 68 L.Ed. 201 (1923); *Encyclopaedia Britannica v. S.S. Hong Kong Producer, supra,* at 18; *The Sarnia,* 278 F. 459, 463 (2d Cir.1921), *cert. denied,* 258 U.S. 625, 42 S.Ct. 382, 66 L.Ed. 797 (1922); *Jones v. The Flying Clipper,* 116 F.Supp. 386 (S.D.N.Y.1953). As we stated in *Nichimen Company v. M.V. Farland,* 462 F.2d 319, 330 (2d Cir.1972), "the duty to load, stow, and discharge cargo— and the consequences for failing to do so properly—fall upon the ship and her owners." 46 U.S.C. § 1303(2) specifically provides, "The carrier shall properly and carefully *load,* handle, stow, carry, keep, care for, and discharge the goods carried." (Emphasis supplied).

■ Applying the foregoing principles to the present case, we conclude that the defendants must be held responsible for the full value of the lost cargo at the time of shipment in Santos and cannot invoke the $500 per package limitation of liability provision of § 4(5) of COGSA, 46 U.S.C. § 1304(5). The carrier here, having received 100 bundles of tin ingots from the shipper in Santos, issued a false F.O.B. bill of lading with respect to its own conduct, warranting that on January 4, 1984, it had

loaded 100 bundles on its ship when in fact it had loaded only 30. The bill of lading, whether or not intentionally false, enabled the shipper to collect from Berisford, the buyer, the full purchase price for 100 bundles. If the carrier had disclosed that 70 bundles had not been loaded, Berisford would have been entitled to refuse payment and the loss would have fallen on the seller of the goods as required by the conditions of the sales contract. The carrier's misrepresentation therefore amounted to a fundamental breach going to the very essence of its contract and precluding it from invoking those provisions extending the limitation of liability terms of § 4(5) of COGSA to the period when the goods were on shore.

■ Defendants cannot escape responsibility on the ground that the four containers into which it claims that it had placed the bundles after receipt from the shipper were locked and sealed at the time when the containers were loaded aboard its ship, the S.S. Salvador. It is undisputed that the defendant received from the shipper the 100 separate bundles and that for its own convenience it placed them in the four containers. It was thereafter responsible for verifying the contents before loading the containers and issuing a clean on board bill of lading. The weight of the missing 70 bundles of tin ingots was approximately 78,885 lbs. Even if opening of the containers posed difficulties, at the very least the carrier owed a duty to verify the weight of the containers at shipside before they were placed aboard its ship and before it stated that they contained 100 bundles of tin ingots weighing the equivalent of 50,647 kilos or 111,656 lbs., which would have been 78,885 lbs. in excess of the weight of the containers actually loaded.

■ Defendants argue that, even if they might have been liable for breach of warranty under pre-COGSA principles outlined

in *Olivier II,* Congress in effect intended the limitation of liability provisions of COGSA to override those principles in a case governed by it. *See* dissenting opinion of Judge Hays in *Encyclopaedia Britannica v. S.S. Hong Kong Producer, supra,* 422 F.2d at 19–20. We disagree, however, since courts in this circuit have long refused to hold that COGSA altered pre-COGSA law with respect to deviation and other conduct carrying the same consequences. *See Elgie & Co. v. S.S. "S.A. Nederburg," supra,* 599 F.2d at 1181 (false representation in bill of lading that cargo was loaded on ship renders $500 per package limitation inapplicable);[4] *Encyclopaedia Britannica v. S.S. Hong Kong Producer, supra,* at 18 (unauthorized on deck stowage of goods renders $500 per package limitation inapplicable); *Jones v. The Flying Clipper, supra* (same).

■ Lastly, Ivarans contends that since the theft of the ingots occurred while the property was in the temporary custody of the Brazilian government it is exempted from liability by § 4(2)(q) of COGSA, 46 U.S.C. § 1304(2)(q), which was incorporated in the parties' contract. Section 4(2)(q) exempts the carrier from liability for damage or loss "arising without the actual fault and privity of the carrier and without the fault or neglect of the agents or servants of the carrier, but the burden of proof shall be on the person claiming the benefit of this exception...." The argument misconceives the nature of Berisford's claim. Its suit is not based on the theft of the ingots or on Ivarans' negligence but on the carrier's false representation that it loaded the 70 bundles on its ship. Regardless whether some third party stole the ingots, the carrier here was obligated to state truthfully what it had loaded. If the carrier had truthfully stated what it had loaded on the ship, Berisford would not have been required to pay the purchase price for the 70 bundles of unloaded ingots which it had

---

4. In *Elgie & Co.* the bill of lading, notwithstanding the absence of liability limitations in the Pomerene Act, did extend by contract the application of COGSA to the entire period of time when the goods were in the carrier's custody.

See 1976 A.M.C. 2446, 2449 & n. 4 (not officially reported). Nevertheless, this was not advanced as a basis for departing from the fundamental rule of *Olivier II.*

contracted to purchase. As between the purchaser, which could not have verified the accuracy of the carrier's representation as to the number of bundles loaded, and the carrier, the carrier is the party that must be held responsible for loss resulting from the falsity of its warranty that the goods had been loaded when in fact it had not put them aboard its ship.

[■■■] Our holding leaves intact the principle that, once goods are aboard the ship as represented, a carrier may be responsible for misdescription of the apparent condition of the goods loaded by it only upon proof of knowledge or intent. *The Carso, supra.* We hold simply that when a carrier misrepresents its own conduct in loading goods aboard ship it is responsible for the misrepresentation and may not invoke contract provisions incorporating COGSA's limitations on liability.

The order and judgment of the district court are reversed and the case is remanded to the district court with directions to enter judgment in favor of Berisford in the sum of its full damages, plus that portion of freight and handling charges attributable to the lost bundles, and costs and interest from January 20, 1984.