**MITSUI MARINE FIRE AND INSURANCE COMPANY, LTD., Plaintiff,**

v.

**DIRECT CONTAINER LINE, INC., Defendant.**

**No. 99 CIV. 9461(LAK).**

United States District Court, S.D. New York.

Oct. 31, 2000.

Bryce A. Larrabee, Bigham Englar Jones & Houston, for Plaintiff.

James E. Ryan, Dougherty Ryan Guiffra Zambito & Hession, for Defendant.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This case concerns a carrier that loaded cargo into the wrong container, resulting in the shipment going to India rather than Japan. The fundamental issue is whether the carrier can invoke the so-called package limitation of liability under the Carriage of Goods by Sea Act ("COGSA").[1]

The parties consented to trial by the Court, sitting without a jury, on a stipulated record. They agreed that the Court may resolve any disputed factual matters and draw any inferences from the record as if the matters had been tried in open court.

### Facts

This dispute arises out of a contract between Joy Mining Machinery ("Joy") and Taiheiyo Kohatsu Inc. ("Consignee") to ship one box of spare parts for mining machines from Joy's facility in Pennsylvania to the Consignee's facility in Japan.[2] Mitsui Marine Fire and Insurance Company ("Mitsui") was the Consignee's insurer. Based on its subrogation interest in the Consignee's claims, Mitsui brought this suit against Direct Container Line, Inc.

("DCL"), which is a "non-vessel operating common carrier" or NVOCC—it arranges for shipment of cargo. As one of its services, DCL also loads containers with cargo.[3]

The facts of this case are largely undisputed. The shipment arrived at DCL's warehouse in New Jersey around August 7.1998,[4] where DCL loaded, stuffed, and sealed the container.[5] On August 12, 1998, DCL issued a bill of lading stating that "box: cutters & continous [sic] miner spares" was in container OOLU552581-1.[6] The bill of lading was "clean," that is, it had no notation that the goods were damaged in any way.[7] A clause on the back of the bill provided that "[t]o obtain higher limits of liability, shipper must declare a greater value and pay additional freight to be agreed."[8] No such value was declared. The bill provided also that COGSA applied "throughout the entire time the goods are in the custody of Carrier until delivered"[9] and that the bill of lading "limits DCL's liability to $500.00 per package."[10]

The container thought to include the shipment (OOLU552581-1) was transported by land from DCL's New Jersey warehouse to Los Angeles, where it was loaded onto the M/V OOCL FIDELITY. When the container arrived in Japan around September 9, it was opened and the shipment was discovered to be missing. The Consignee replaced the missing shipment by buying a box of miner spares that was delivered by air,[11] and Mitsui paid the Consignee in full based on a claim for non-

---

1. 46 U.S.C. app. §§ 1300–1315 (1975 & Supp.2000).

2. *See* Second Am. Joint Pretrial Order ("PTO"), Stipulated Facts ¶¶ 3–4.

3. *See id.* ¶¶ 6–7.

4. *See id.* ¶ 8.

5. *See* Newman Dep. at 81.

6. Pl.Ex. 2 (bill of lading).

7. *See* Pl.Ex. 2. *See generally* 2 THOMAS J. SCHOENBAUM, ADMIRALTY AND MARITIME LAW § 10–12, at 56 (2d ed.1994) (hereinafter SCHOENBAUM).

8. Pl.Ex. 2 (back missing); Def. Notice of Mot., Ex. A, cl. 35(c) (back of bill).

9. *Id.* at A (back of bill).

10. *Id.* cl. 35(c) (back of bill).

11. *See* PTO, Stipulated Facts ¶ 12.

delivery.[12]

The missing shipment surfaced in India on October 27, 1998, and ultimately arrived in Japan in April 1999. Whether the shipment was tendered to the Consignee in April is disputed, but the parties agree that the Consignee took delivery of the cargo in June 1999, at which point it rejected the shipment.[13] The Consignee had a survey performed on June 14, 1999, and a survey report prepared on February 21, 2000, after litigation began.[14] The Consignee ultimately bought the cargo as salvage through one of its affiliates for 905,-000 Japanese yen.[15]

*Discussion*

■ DCL concedes its liability for breach of the contract of carriage.[16] As both parties point out, DCL's claims manager said that "someone in the warehouse in New Jersey mis-loaded this cargo."[17] This mis-loading undisputedly resulted in delayed delivery. The concept of "loss or damage" in COGSA Section 4 includes both physical damage and loss or damage caused by delay.[18] Therefore, a carrier can be liable under COGSA for financial loss caused by delayed delivery.

12. *See* Def. Ex. A (Subrogation Form); Perez Dep. at 10.

13. *See* PTO, Stipulated Facts ¶¶ 19–21.

14. *See id.* ¶ 22; Pl.Ex. 17 (Survey Report); Perez Dep. at 21.

15. *See* Pl.Ex. 20 (e-mail from Hiroaki Nanba to Richard Perez, May 16, 2000).

16. *See* Def. DCL Trial Mem., Prelim.

17. PTO at 9, 21; Newman Dep. at 15.

18. *See Commercio Transito Internazionale., Ltd. v. Lykes Bros. S. S. Co.*, 243 F.2d 683, 686 (2d Cir.1957). *See generally* 2 SCHOENBAUM § 10–37, at 161.

19. *See* PTO at 1. The defendant argues also, alternatively, that the plaintiff showed no damage. *See* PTO at 21.

20. *See* 2 SCHOENBAUM § 10–32, at 138.

Because the defendant has conceded liability for delayed delivery, the only remaining issue is the amount of damages. The plaintiff argues that it is entitled to damages of $58,708.17, while the defendant contends that COGSA's $500–per–package limitation applies.[19] Whether the limitation applies turns on whether the carrier made an unreasonable deviation.

I. Unreasonable Deviation and COGSA's Limitation of Liability

The concept of deviation grew out of the pre-COGSA law of marine insurance, in which a carrier's deviation from its contract voyage would void insurance, making the carrier liable in place of the insurer for loss or damage to the cargo.[20] To protect shippers, contractual limits on carriers' liability did not apply in cases of such deviation.[21]

The survival of this doctrine and its effect on limitations of carrier liability were uncertain after COGSA was enacted in 1936,[22] in part because COGSA refers to "unreasonable deviation" without defining the term[23] or clarifying its relationship to COGSA's limitation of carrier liability to the $500 per package in Section 4(5).[24] Case law has filled in the gaps.

21. *See, e.g., Thyssen, Inc. v. S.S. Fortune Star*, 777 F.2d 57, 63–64 (2d Cir.1985) (Friendly, J.).

22. 49 Stat. 1207 (1936).

23. Section 4(4) provides:
"Any deviation in saving or attempting to save life or property at sea, or any reasonable deviation shall not be deemed to be an infringement or breach of this chapter or of the contract of carriage, and the carrier shall not be liable for any loss or damage resulting therefrom: *Provided, however,* That if the deviation is for the purpose of loading or unloading cargo or passengers it shall, prima facie, be regarded as unreasonable." 46 U.S.C. app. § 1304(4).

24. *See* 46 U.S.C. app. § 1304(5) ("Neither the carrier nor the ship shall in any event be or become liable for any loss or damage to or in connection with the transportation of goods in an amount exceeding $500 per pack-

---

**415**

■ Although once in doubt, the consequences of finding that a carrier made an "unreasonable deviation" are now well established in the Second Circuit: the carrier is barred from invoking the $500 COGSA limitation of liability.[25] As Mitsui concedes, if "DCL's actions do not constitute an unreasonable deviation, Mitsui's damages are limited to $500.00." [26]

What qualifies as an "unreasonable deviation" is more complex. The term originally referred to a "carrier's departure from the required geographic route," [27] but some courts have extended the doctrine to some non-geographic deviations from the contract.[28] Beyond the core category of a ship's geographic deviations, the Second Circuit has applied the doctrine to unauthorized on-deck stowage of cargo.[29] Nonetheless, it has declined to extend it to unseaworthiness of a vessel, even if known to the vessel's owner,[30] or to nondelivery of goods even when that nondelivery is criminal.[31] In *Sedco v. S.S. Strathewe*,[32] on which the defendant relies, the Circuit went so far as to state that "unreasonable deviation" is limited to two circumstances: "geographic deviation and unauthorized on-deck stowage." [33]

In a second line of cases, the Second Circuit has established that a carrier that issues a false bill of lading loses the benefit of a valuation clause in the bill of lading.[34]

age lawful money of the United States ... unless the nature and value of such goods have been declared by the shipper before shipment and inserted in the bill of lading.").

25. *See SNC S.L.B. v. M/V Newark Bay*, 111 F.3d 243, 248 (2d Cir.1997); *Sedco, Inc. v. S.S. Strathewe*, 800 F.2d 27, 30 (2d Cir.1986); *Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68, 70–71 (2d Cir. 1974), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975); *Encyclopaedia Britannica, Inc. v. S. S. H.K. Producer*, 422 F.2d 7, 18 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *Jones v. The Flying Clipper*, 116 F.Supp. 386, 387 (S.D.N.Y.1953). *But see Atlantic Mut. Ins. Co. v. Poseidon Schiffahrt*, 313 F.2d 872, 874–75 (7th Cir.1963), *cert. denied*, 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 53 (1963).

26. Pl. Trial Br. at 16.

27. 2A BENEDICT ON ADMIRALTY § 123, at 12–13 (7th ed. Mar.2000) (hereinafter BENEDICT); *see also, e.g., The Willdomino v. Citro Chem. Co.*, 272 U.S. 718, 47 S.Ct. 261, 71 L.Ed. 491 (1927).

28. *See* 2A BENEDICT § 123, at 12–12.

29. *Encyclopaedia Britannica, Inc. v. S. S. H.K. Producer*, 422 F.2d 7, 18 (2d Cir.1969), *cert. denied*, 397 U.S. 964, 90 S.Ct. 998, 25 L.Ed.2d 255 (1970); *see also Jones v. The Flying Clipper*, 116 F.Supp. 386, 387–88 (S.D.N.Y.1953).

30. *See Iligan Integrated Steel Mills, Inc. v. S.S. John Weyerhaeuser*, 507 F.2d 68, 72–73 (2d Cir.1974) (alternative ground for decision), *cert. denied*, 421 U.S. 965, 95 S.Ct. 1954, 44 L.Ed.2d 452 (1975).

31. *See B.M.A. Indus., Ltd. v. Nigerian Star Line, Ltd.*, 786 F.2d 90, 92 (2d Cir.1986) (criminal nondelivery); *Italia Di Navigazione, S.p.A. v. M.V. Hermes I*, 724 F.2d 21, 22 (2d Cir.1983) (nondelivery).

At least one district court has pointed out the tensions in these cases:

"[T]he law of this Circuit seems to have created an unjust paradox: a carrier who stowes [*sic*] cargo on deck without the shipper's authorization loses COGSA's per package limitation; and yet, a carrier who recklessly tenders an unseaworthy ship which consequently sinks with all its cargo and crew, gets the benefit of the package limitation. In addition, a carrier who misrepresents the onboard status of the cargo in its bill of lading will lose COGSA's package limitation, regardless of whether the misrepresentation was fraudulent; and yet, a carrier who fraudulently misrepresents that its ship is seaworthy can successfully benefit from the package limitation." *Complaint of Tecomar S.A.*, 765 F.Supp. 1150, 1185 n. 95 (S.D.N.Y.1991) (Tenney, J.) (citations omitted).

32. 800 F.2d 27 (2d Cir.1986).

33. *Id.* at 31.

34. *See Berisford Metals Corp. v. S.S. Salvador*, 779 F.2d 841, 846 (2d Cir.1985), *cert. denied*, 476 U.S. 1188, 106 S.Ct. 2928, 91 L.Ed.2d 556 (1986); *Elgie & Co. v. S.S. "S.A. Nederburg,"* 599 F.2d 1177, 1181 (2d Cir.1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980); *Olivier Straw Goods Corp. v. Osaka Shosen Kaisha*, 27 F.2d 129, 133 (2d Cir.1928) (*Oliver I*), *aff'd after remand*, 47 F.2d 878, 880 (2d Cir.1931) (*Oliver*

The most recent case in this line is *Berisford Metals Corp. v. S.S. Salvador,*[35] on which the plaintiff relies. Issuing a false bill of lading can be "likened ... to a substantial deviation in voyage or stowage which would also nullify valuation clauses."[36] However, *Berisford* did not depend on characterizing it this way. The *Berisford* court's main concern was to protect reliance on bills of lading because of their role as "an acknowledgment by a carrier that it has received the described goods for shipment," "a contract of carriage" and "a document of title": "Whether one likens the carrier's issuance of a false bill of lading ... to a 'deviation,' a 'breach of warranty' or a representation which it must be 'estopped' to deny, its adverse impact on trade and on reliance on bills as an essential method of facilitating trade is serious."[37] That is, a false bill of lading results in a breach of the bill's warranty that goods are laden as indicated, or a false bill can be said to estop the carrier from denying what the bill represents as true.

In *Berisford*, the Second Circuit both recognized that deviation had been limited in the circuit and adhered to the proposition that the package limitation "may not be invoked by a carrier that has issued an on board bill of lading erroneously representing that goods were loaded aboard its ship."[38]

## II. DCL's "Deviation"

■ The plaintiff argues that the package limitation does not apply here because the erroneous bill of lading, the *shipment's* (but not the *ship's*) trip to India, and/or the delayed delivery of the miner spares

qualify as unreasonable deviations. As the Court concludes that the issuance of a false bill of lading deprived defendants of COGSA's $500 package limitation, there is no need to address the two latter points.

The plaintiff cites *Berisford* for the proposition that a false bill of lading is an unreasonable deviation under COGSA. In *Berisford*, the plaintiffs paid for a shipment when the defendant carrier presented them with a bill of lading mistakenly representing that cargo had been loaded on board.[39] Concerned with protecting reliance on bills of lading, the Second Circuit held that the carrier could not invoke COGSA's limitation on liability.[40] Several months later in *Sedco*, the Second Circuit rejected the idea that a manifest mistakenly indicating that packages still were on board after an intermediate stop amounted to anything more than negligence.[41]

Despite this apparent tension between the cases, *Sedco* and *Berisford* addressed different situations. In *Sedco*, the bill of lading was correct at the time it was issued. In *Berisford*, the cargo never was loaded onto the ship, rendering the bill of lading false from the outset. Similarly, DCL never loaded the shipment at issue in this case into the correct container, but nonetheless issued a clean bill of lading indicating that the shipment was in that container.[42]

The absence of an allegation or evidence that DCL acted fraudulently is irrelevant: for a carrier to lose the package limitation, it is enough that a bill of lading be erroneous, regardless of whether that carrier acted fraudulently.[43]

The central question in *Berisford*, as it is here, is "whether a carrier that issues a

---

*II*), *cert. denied*, 283 U.S. 856, 51 S.Ct. 648, 75 L.Ed. 1462 (1931).

**35.** 779 F.2d 841 (2d Cir.1985).

**36.** *Elgie & Co.*, 599 F.2d at 1181 (citing *Olivier II*, 47 F.2d at 880).

**37.** *Berisford*, 779 F.2d at 845, 846.

**38.** *Berisford*, 779 F.2d at 846.

**39.** *See id.* at 844.

**40.** *Id.* at 846–47, 849.

**41.** *See Sedco*, 800 F.2d at 32.

**42.** Pl.Ex. 2.

**43.** *See Berisford*, 779 F.2d at 846 (citing *Elgie & Co. v. S.S. S.A. Nederburg*, 599 F.2d 1177, 1181 (2d Cir.1979), *cert. denied*, 444 U.S. 1072, 100 S.Ct. 1016, 62 L.Ed.2d 753 (1980)).

clean on board bill of lading erroneously stating that certain goods have been received on board when they have not been so loaded should be precluded from limiting its liability pursuant to an agreement binding the parties to the terms of § 4(5) of COGSA." [44] The Second Circuit answered "yes" to this question in *Berisford.* This Court sees no basis for disregarding this precedent here. Accordingly, this Court holds that DCL cannot rely on the protection of the package limitation.

III. Damages

▮ While, as discussed above, DCL has conceded delay, the plaintiff has the burden of proving the amount of damages. The measure of damages in the case of delay normally is the difference between the goods' fair market value at the time and place they should have arrived and their market value when they actually did arrive. [45] When the market price is not proved, as in this case, the invoice price may substitute for the initial market price. [46] The parties have stipulated that the invoice price was $64,937.43. [47] Insurance and ocean freight amounted to $548.75, [48] which brings the cost, insurance and freight value to $65,486.18.

Both the value of the shipment upon arrival in Japan and the validity of the survey that established this value are contested. But the record is sufficient irrespective of the survey. [49] As a rational economic actor, the plaintiff will have maximized the salvage value obtained. Accordingly, the Court finds that the net proceeds from the sale of the shipment for salvage, 905,000 Japanese Yen, [50] or $6,778.01, [51] reflected the fair market value of the goods. Accordingly, the Court finds that Mitsui has shown damages of $58,708.17.

▮ In admiralty cases, pre-judgment interest is denied only in extraordinary circumstances. [52] This case does not present extraordinary circumstances that would warrant such action, so plaintiff is entitled to pre-judgment interest. Pre-judgment interest is "ordinarily awarded from the time when destroyed or lost goods should have been delivered by the carrier," [53] although the district court has broad discretion to decide when interest begins and what rate to apply. [54] In this case, delivery was supposed to take place on September 9, 1998. Mitsui therefore will recover interest from that date to the date of judgment at a rate of five percent.

*Conclusion*

The foregoing constitutes the Court's findings of fact and conclusions of law

44. *Id.* at 845.

45. *See* 2 SCHOENBAUM § 10–36, at 154.

46. *See id.* § 10–36, at 155.

47. PTO, Stipulated Facts ¶ 23.

48. PTO, Stipulated Facts ¶ 24.

49. There is no evidence that DCL had notice of the survey. The Second Circuit has noted that the rule that "where the party charged with liability for the damage is not given notice of any survey of the alleged damage and no excuse for such failure is shown, the claim of damage is to be viewed with some suspicion" is to "serve as [a] guide[ ] to decision as to the weight to be given the evidence relating to the facts in issue." *Shepard S.S. Co. v. United States,* 111 F.2d 110, 113 (2d Cir.1940).

50. Pl.Ex. 17; Def. Ex. D (Survey Report). This amount represents 1,000,000 yen for the parts as valued by the surveyor, plus a 5% consumption tax of 50,000 yen, minus import charges of 145,000 yen. *See id.*

51. This conversion from yen to dollars used September 9, 1998 as the conversion date. *See* Pl. Trial Br. at 29.

52. *See Independent Bulk Transp., Inc. v. The Vessel "Morania Abaco,"* 676 F.2d 23, 25 (2d Cir.1982); *Mitsui & Co. v. American Export Lines, Inc.,* 636 F.2d 807, 823 (2d Cir.1981).

53. *Mitsui & Co.,* 636 F.2d at 824.

54. *Independent Bulk Transp.,* 676 F.2d at 25 (citing *The Hygrade No. 24 v. The Dynamic,* 233 F.2d 444, 448 (2d Cir.1956)).

pursuant to Federal Rule 52(a). Mitsui is entitled to judgment in the amount of $58,708.17 with interest at the rate of five percent from September 9, 1998 to the date of judgment.

SO ORDERED.