SOCIETE GENERALE, Plaintiff,

v.

FEDERAL INSURANCE CO. and
Chubb & Son, Inc., Defendants.

FEDERAL INSURANCE COMPANY,
Third–Party Plaintiff–Appellant,

v.

FLOTA MERCANTE GRANCOLOMBIA-
NA, S.A., Third–Party
Defendant–Appellee.

No. 963, Docket 88–7022.

United States Court of Appeals,
Second Circuit.

Argued April 6, 1988.

Decided Aug. 26, 1988.

Jerome Murray, New York City (Michael
Maillet, Hendler, Murray & Mait, P.C.,
New York City, of counsel) for third-party
plaintiff-appellant.

Darrell K. Fennell, New York City (Ronald C. Minkoff, Michael Winger, Fennell &
Minkoff, New York City, of counsel) for
third-party defendant-appellee.

Before LUMBARD, OAKES and
MINER, Circuit Judges.

MINER, Circuit Judge:

Third-party plaintiff-appellant Federal Insurance Co. ("Federal") appeals from a portion of a judgment entered after a jury trial in the United States District Court for the Southern District of New York (Sand, J.) in favor of third-party defendant-appellee Flota Mercante Grancolombiana, S.A. ("Flota"). On this appeal, Federal challenges the entry of a directed verdict on Federal's "estoppel" theories of liability. Finding no

merit in its claim, we conclude that a verdict properly was directed in Flota's favor.

## BACKGROUND

Societe Generale ("Societe"), a French bank, commenced the principal action before Judge Sand to recover under the "extended forgery" provision of a bankers' blanket bond and policy issued by Federal. The policy insured against losses resulting from Societe's good faith acceptance of a counterfeited or forged title document. Societe claimed recompense under this provision for a loss due to the fraud perpetrated by one of its customers, Colombian Coffee Company ("CCC"). CCC was controlled by Alberto and Victor Duque, who also were the principals in Luis A. Duque Pena E Hijos, Ltda. ("LDPH"), a Colombian coffee supplier. CCC acted as the agent for LDPH in the United States. Through these two companies, and with the help of their employees, Guillermo Sepulveda and Fernando and Camilo Bautista, the Duques designed and executed a scheme that ultimately bilked Societe of approximately $3,000,000.

The Duques used CCC to implement their fraudulent scheme. CCC regularly purchased coffee from Colombian suppliers for resale to U.S. purchasers. As American agent for LDPH, CCC regularly purchased coffee from LDPH in Colombia and resold it in the U.S. CCC maintained a line of credit with Societe that was used to finance these purchases. By drawing on its credit line, CCC was able to pay LDPH without first reselling the coffee to an American buyer.

The amount advanced depended on the size and quality of the shipments, which were documented by bills of lading issued by the ocean carrier when it took possession of the coffee in Colombia. The bills, representing title to the goods at the destination port, were issued to CCC. CCC would present these bills to Societe and, after examination, the bank would authorize an advance. Although CCC negotiated the bills to Societe, the bank ultimately indorsed them to CCC, taking a security interest in the coffee (through a "Trust Receipt" executed by CCC) in lieu of actual title to the goods. This allowed CCC, as holder of the bills, to take delivery of the coffee upon arrival in the U.S. and resell it. CCC would use part of the proceeds of this sale to pay back the Societe loan; the remainder of the proceeds was CCC's profit on the venture.

The Duques apparently recognized that Societe was not able to check closely the bills of lading submitted by CCC. They fabricated bills of lading, representing nonexistent coffee shipments, and presented them (through CCC) to Societe. To facilitate this fraud, the Duques secured blank copies of bills of lading used by Flota, an ocean shipping line. The Duques completed the blank bills using fictitious shipping information; the bills were presented to the bank with all necessary stamps affixed and were purported to be signed by an authorized Flota signatory. However, the signatures on the bills were illegible and could not be identified at trial by anyone familiar with the signatures of authorized Flota signatories.

On the strength of these false bills, Societe made two loans, one on November 15, 1982 for $1,300,000 and one on November 19 for $1,560,000. CCC defaulted, and thereafter Societe discovered that the security for the loans was spurious. Federal refused Societe's demand to be compensated for these losses under the bankers' blanket bond and policy, and this suit followed. Federal impleaded Flota, seeking indemnity for its liability to Societe, claiming that: (1) Flota had failed to exercise due care to prevent unauthorized access to its blank bills, thereby making the Duques' fraud possible; and (2) Flota was estopped from denying the validity of the bills under the Uniform Commercial Code and New York common law.

At trial, Federal attempted to link Ramon Abadia, an employee of Flota's port agent, Transportadora Grancolombiana, S.A. ("Transportadora"), to the Duques. Federal argued that the evidence established a conspiracy involving Abadia, the Duques and others. It claimed that Abadia had been bribed to provide blank Flota bills

of lading to the Duques. Federal attempted to show that the bills were provided with the necessary stamps (voyage number, date and bill of lading number) already affixed, and that, in some cases, the bills had been signed by Abadia. Federal's evidence included the expert testimony of Gregory McNally concerning the authenticity of the signatures and stamps on the false bills, and testimony of Camilo and Fernando Bautista, employees of the Duques, about their knowledge of the fraud. The Bautistas recounted various statements of Alberto and Victor Duque that included references to "the office of Flota in Buenaventura," and their "friend in Buenaventura." In at least one conversation, Abadia was mentioned by name.

Appellant offered other evidence of Abadia's involvement including a purported summary of the financial information of an LDPH-related company indicating that the Duques made a payment to Abadia (the "Extracto"); a signed statement of Guillermo Sepulveda purportedly certifying the Extracto as a business document; an excerpt from Sepulveda's testimony in a Colombian court; and an exculpatory statement made by Sepulveda implicating Abadia. Judge Sand eventually excluded this evidence on various grounds.

Abadia testified for Flota, denying his involvement in the fraudulent scheme. He admitted that he had authority to sign bills of lading, but claimed that he was not authorized to appoint another to sign the bills; only his supervisor, the General Manager of Transportadora, had the authority to designate Flota signatories. Abadia also noted that although the stamps used to authenticate bills of lading were kept by Transportadora in the office where he worked, they were stored in a locked drawer to which he did not have access. Under repeated questioning, Abadia denied affixing the stamps to the blank bills or signing them.

At the close of Federal's case, Flota moved for a directed verdict. Judge Sand ruled that Federal had failed to offer sufficient evidence to support its estoppel claims and directed verdict on those claims.

However, Federal's negligence claim was submitted to the jury.

The jury returned a special verdict in favor of Societe on its claim against Federal. The jurors found specifically that the bills of lading submitted to the bank were signed with an intent to deceive "people into believing that they were signed by an authorized representative of Flota by someone who: 1. signed a name other than his own, and who 2. was not an employee of Flota or an authorized representative of Flota." Joint App. at 155a. On Federal's third-party claim, the jury found that Federal had not sustained its burden of proving that: (1) Flota was negligent and (2) Flota's negligence was the proximate cause of Federal's loss. Federal's motion for a judgment n.o.v. subsequently was denied.

Federal appeals the entry of the directed verdict. In support of its claim, appellant argues that the district court erred in excluding its profferred hearsay evidence linking Abadia to the Duques. For the reasons that follow, we find no error in Judge Sand's determinations.

## DISCUSSION

A directed verdict motion may be granted only after the trial judge concludes, viewing the evidence in the light most favorable to the non-movant, that " '(1) there is a complete absence of probative evidence to support a verdict for the non-movant or (2) the evidence is so strongly and overwhelmingly in favor of the movant that reasonable and fair minded men in the exercise of impartial judgment could not arrive at a verdict against him.' " *Mattivi v. South African Marine Corp., "Huguenot",* 618 F.2d 163, 167 (2d Cir.1980) (citations omitted) (quoting *Armstrong v. Commerce Tankers Corp.,* 423 F.2d 957, 959 (2d Cir.), *cert. denied,* 400 U.S. 833, 91 S.Ct. 67, 27 L.Ed.2d 65 (1970)). We find that Judge Sand correctly granted the directed verdict motion, because Federal had no hope of sustaining its burden on its common-law and Uniform Commercial Code theories.

## Estoppel Under the UCC

Federal contends that Flota cannot avoid liability under the bills of lading because: (1) under N.Y.U.C.C. § 1–202, the bills are presumptively valid; and (2) under N.Y. U.C.C. § 7–301, Flota, the "issuer" of the bills of lading, is liable for the "non-receipt or misdescription of the goods" to Federal, the "holder" of the false bills. Section 1–202 provides that a document issued by a "third-party" to a contract "shall be prima facie evidence of its own authenticity and genuineness and of the facts stated in the document by the third party" *if* the document is "authorized or required by the contract to be issued." N.Y.U.C.C. § 1–202 (McKinney 1964). The document is prima facie evidence, but the court must make "the ultimate determination of the facts where the accuracy or authenticity of the documents is questioned." *Id.* comment 3.

The presumption of trustworthiness only applies to "actions arising out of the contract which authorized or required the document," *id.* comment 2; *see Standard Textile Co. v. National Equip. Rental, Ltd.,* 80 A.D.2d 911, 911, 437 N.Y.S.2d 398, 399 (1981) (document not required "by the contract sued upon by the plaintiff"), because of the "preferred status" given the document by the parties themselves," N.Y. U.C.C. § 1–202 comment 2. We question whether Federal's suit against Flota might be characterized as "arising out of" a contract requiring the bills of lading at issue. Certainly, Flota and Federal's subrogor, Societe, were not parties to a contract calling for the bills of lading.

■ Nevertheless, even assuming that § 1–202 might apply, Federal's argument must fail. The rule merely establishes a presumption of authenticity, which may stand in the absence of evidence to the contrary. As Comment 3 indicates, the court must ultimately decide the issue when the accuracy or authenticity of the document is questioned. Therefore, the presumption cannot "estop" Flota from denying the validity of the document. In fact, neither party disputes the lack of authenticity of the bills; the bills always have been considered false. Under the circumstances, we find irrelevant Federal's attempt to attach a "presumption of validity" to the bills of lading based on § 1–202.

■ Federal's Article 7 argument also is flawed. Under § 7–301,

a holder to whom a negotiable bill has been duly negotiated relying upon ... the description therein of the goods ... may recover from the issuer damages caused by ... the non-receipt or misdescription of the goods....

N.Y.U.C.C. § 7–301(1). The gravamen of Federal's argument is that it is subrogated to Societe's right, as "holder" of the bills, to collect from Flota for the non-receipt of the collateral described in the false bills of lading. Before Judge Sand, and again on appeal, Flota argued, *inter alia,* that this section could provide Federal no remedy because Flota was not the "issuer" of the false bills. We agree.

A document of title, by definition, does not exist until "issued." 7 R. Anderson, Uniform Commercial Code § 7–102:7, at 453 (1985) [hereinafter Anderson]; *see* N.Y.U.C.C. § 1–201(15). "Issue" is not defined in the Code with respect to bills of lading, but some affirmative action acknowledging receipt of the goods is a prerequisite to "issuance," *see, e.g., Mattel, Inc. v. Interstate Contract Carrier Corp.,* 722 F.2d 17, 18 & n. 1 (2d Cir.1983) (carrier's employee confirmed shipper's description in prepared bill and signed it, "technically" issuing the bill); 45 N.Y.Jur.2d *Documents of Title* § 31, at 73 (1985) (issuer's signature "is essential to the existence of a bill of lading under the Code"); *cf.* 7 Anderson, *supra,* § 7–102:7, at 454 ("warehouse receipt is not issued until it is executed, signed, and delivered to the person entitled" to it). Similarly, § 7–102 defines "issuer" as a "bailee who issues a document [of title]." N.Y.U.C.C. § 7–102(1)(g); *see id.* § 7–102(1)(e) (" 'Document' includes document of title"). A "bailee" is one "who by a ... bill of lading ... *acknowledges possession* of goods and contracts to deliver them." *Id.* § 7–102(1)(a) (emphasis added); *see also Berisford Metals Corp. v. S/S Salvador,*

779 F.2d 841, 845 (2d Cir.1985) (generally, bill of lading "constitutes an acknowledgement by a carrier that it has received the described goods for shipment"), *cert. denied*, 476 U.S. 1188, 106 S.Ct. 2928, 91 L.Ed.2d 556 (1986). Therefore, Federal's case depended directly upon proof of Flota's "acknowledgement" of possession. However, as Judge Sand ultimately concluded, Federal was unable to present sufficient evidence to establish this critical aspect of its claim.

At trial, Federal hoped to identify Ramon Abadia, an employee of Flota's port agent, Transportadora, as the individual whose signatures appeared on the false bills, relying upon the Code's definition of "issuer" to include "any person for whom an agent or employee purports to act in issuing a document if the agent or employee has real or apparent authority to issue documents," N.Y.U.C.C. § 7–102(1)(g). This was an apparent attempt to cast the claim as one involving a spurious bill, issued by an employee of the carrier at the behest or inducement of a defrauder, *see* J. White & R. Summers, Handbook of the Law Under the Uniform Commercial Code § 20–4, at 806; § 21–4, at 862–63 (2d ed. 1980) (hereinafter "White & Summers"); *see also* N.Y.U.C.C. § 7–301 comment 3.

Federal's evidence on this point was, at best, inconclusive. Its expert witness, McNally, testified that the signatures on the bills did not match those appearing on valid Flota bills of lading. Another Transportadora employee, Galdys Savi, also testified that the signatures did not resemble the signature of any Transportadora employee authorized to sign such documents. McNally could not identify Abadia as the person who had signed the false bills, nor could he eliminate Abadia as the signatory.

Judge Sand noted that the evidence presented could not support Federal's claim that Abadia signed the bills. Based on the record before the judge, we agree. Ultimately, the jury confirmed that conclusion when it returned a special verdict in the main action finding that the bills had been "forged" or "counterfeited": Judge Sand had instructed the jurors that they could reach that conclusion only if they determined that the bills had been "signed by a person who signed a name other than his own and ... who was not an employee of Flota or an authorized representative of Flota," Joint App. at 155a.

On appeal, Federal concedes that "[t]he identity of the person who affixed what purports to be the signature of Flota on the bills of lading has never been ascertained." Brief of Federal at 16. It claims, however, that Abadia's participation in "a conspiracy whose purpose was the issuance of the bills of lading" renders the identity of the actual signatory "of no consequence." *Id.* Federal asserts that Abadia supplied blank bills of lading to the Duques, who completed the bills and signed them. Arguing from the premise that conspirators may be held liable for the acts of their co-conspirators, *see Newburger, Loeb & Co. v. Gross*, 563 F.2d 1057, 1074 (2d Cir.1977), *cert. denied*, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed. 2d 782 (1978), appellant claims that the Duques' act in completing the bills is attributable to Abadia, thus establishing Flota's acknowledgement of possession under the Code.

Federal's argument confuses co-conspirator *liability*, the issue in *Gross, see id.*, with co-conspirator *authority*. Under New York law, proof of conspiracy may be established by " 'adequately common action for a common purpose by common agreement or understanding among a group, *from which common responsibility derives.*' " *Id.* (emphasis added) (quoting *Goldstein v. Siegel*, 19 A.D.2d 489, 493, 244 N.Y.S.2d 378, 382 (1963)). Thus, Abadia might, as a co-conspirator, be liable for the Duques fraud or forgery. However, Abadia's participation in the conspiracy does not, standing alone, cloak the Duques with the authority to sign the bills for Flota.

In fact, as Flota claims, Federal's argument is really an attempt to establish, using conspiracy proof, that Abadia delegated his authority as a Flota signatory, expressly or impliedly, to the Duques. Although, under general principles of agency, an agent is empowered to delegate his authority to perform ministerial tasks to sub-

agents, *see* 2 N.Y.Jur.2d Agency § 150, at 581 (1979), an examination of the entire record in this case fails to reveal the existence of any evidence of such a delegation. Federal concedes that the identity of the signatory of the spurious bills is unknown; the record contains no evidence of when and under what circumstances the bills were signed. The proof of Abadia's involvement in the conspiracy, tenuous at best, does not establish any of these critical details. Therefore, we find that Judge Sand wisely declined to allow the jury to speculate on these issues on the basis of such a thin record. Giving Federal the benefit of every inference, we conclude that it failed to establish that Abadia delegated his signing authority to the Duques.

Moreover, Abadia's unrebutted testimony indicates that he was powerless to delegate signing authority: The only Transportadora employee with the power to authorize others to sign on Flota's behalf was the General Manager of Transportadora, Abadia's superior. *See* Brief of Flota at 24 (quoting Trial Transcript at 2187). Thus, even if Federal had submitted evidence that Abadia delegated signing authority to the Duques, that delegation would have been ineffective and the Duques' completion of the blank bills, therefore, would have been unauthorized.

Finally, we note that Abadia's involvement did not cloak the Duques with apparent authority to complete the bills. "Apparent authority is dependent on verbal or other acts by a principal which reasonably give an appearance of authority.... [T]he third party must be aware of them." *Greene v. Hellman*, 51 N.Y.2d 197, 204, 433 N.Y.S.2d 75, 80, 412 N.E.2d 1301, 1306 (1980). Flota had no contact with Societe until after the discovery of the fraud. Similarly, Abadia never dealt with Societe, nor could his participation in the conspiracy convey apparent authority, for there is no evidence that Societe ever knew of Abadia's arrangement with his alleged cohorts.

Accordingly, even after viewing the evidence in the light most favorable to Federal, we find that Federal's evidence in support of its Article 7 claim was insufficient to warrant the jury's consideration. Federal failed to establish Flota as the issuer of the bills for purposes of § 7–301. Abadia did not sign the bills; in fact, according to Federal, he transferred the bills in blank. No description of the goods, date of shipment or other pertinent information appeared on the bills at the time Abadia allegedly released the documents into the stream of commerce, and the Duques acted without authority to bind Flota when they completed the documents. Under the circumstances, we decline to charge Flota with "acknowledgment" of the receipt of goods, within the meaning of the UCC, without more proof. Federal's evidence provided no basis for recourse against Flota under the Code.

In light of our disposition of Federal's UCC claims, we need not reach the merits of its evidentiary objections. The excluded evidence—Sepulveda's testimony before a Columbian court referring to payments to Abadia; the "Extracto" establishing payments to Abadia; and Sepulveda's statement, made a month after the conspiracy was uncovered, implicating Abadia as a conspirator—merely lent additional support to Federal's contention that Abadia was an active participant in the fraud. The evidence before Judge Sand on the directed verdict motion included the Bautistas' testimony linking Abadia to the conspiracy, and that testimony was taken as true for purposes of deciding the motion. As we have noted, even assuming Abadia's involvement in the conspiracy as established by this evidence, Federal's UCC claims properly were dismissed. Thus, the excluded evidence would not have changed the result, and the error, if any, was harmless.

*Equitable Estoppel*

Federal also claims error in Judge Sand's rejection of the equitable estoppel doctrine as a basis for Flota's liability. This argument merits little discussion. Under New York law, " 'where one of two innocent persons must suffer by the acts of a third, he who has enabled such third person to occasion the loss must sustain it,' " *Bunge Corp. v. Manufacturers Hanover Trust Co.*, 31 N.Y.2d 223, 228, 335

N.Y.S.2d 412, 415, 286 N.E.2d 903, 905 (1972) (quoting *National Safe Deposit Savings & Trust Co. v. Hibbs*, 229 U.S. 391, 394, 33 S.Ct. 818, 819, 57 L.Ed. 1241 (1913)). Federal seizes on this broad language to argue that, as between Federal's subrogor and Flota, Flota was clearly in the better position to prevent the fraud. Therefore, Federal argues, Judge Sand erred in refusing to submit the equitable estoppel claim to the jury, requiring a new trial.

We disagree. The *Bunge* maxim rests on notions of essential fairness, and, as with any equitable basis for relief, its application lies in the sound discretion of the trial judge. *Indyk v. Habib Bank, Ltd.*, 694 F.2d 54, 57 (2d Cir.1982). We conclude that Judge Sand acted well within his discretion in determining that the instant case did not warrant such equitable relief. Characteristically, the doctrine is invoked successfully against a party who has occasioned a loss through an obvious lack of care or an affirmative act fairly identified as the cause of the loss. *See, e.g., Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 587, 446 N.Y.S.2d 917, 921, 431 N.E.2d 278, 282 (1981) (executing estoppel certificate representing that mortgage is valid and existing); *Bunge*, 31 N.Y.2d at 228–30, 335 N.Y.S.2d at 415–17, 286 N.E.2d at 905–06 (entrusting to employee cashier's checks in freely returnable form); *Meyerson v. Lawyers Title Ins. Corp.*, 39 A.D.2d 190, 193–94, 333 N.Y.S.2d 33, 34–35 (1972) (cloaking agent with apparent authority to issue title insurance policies), *aff'd*, 33 N.Y.2d 704, 349 N.Y.S.2d 675, 304 N.E.2d 371 (1973); *Aliuga v. Perera Co.*, 494 F.Supp. 18, 21–22 (S.D.N.Y.1979) (failing to discover material alteration in check deposited by bank's customer).

In contrast, equity does not compel us to conclude that Flota should stand liable in this case. The blank bills were not entrusted to an employee in freely transferable form. In fact, in direct contrast to *Bunge*, where the court noted that "no forgery or unauthorized indorsement was necessary" to facilitate the fraud, 31 N.Y.2d at 229–30, 335 N.Y.S.2d at 416, 286 N.E.2d at 906, the scheme here was facilitated by forgery, as the jury ultimately found. Nor was appar-

ent authority at issue, for, as we noted above, there were no direct dealings between Abadia and Societe. *See Greene*, 51 N.Y.2d at 204, 433 N.Y.S.2d at 80, 412 N.E.2d at 1306. Finally, the jury's determination that Flota exercised due care with respect to the blank bills confirms our conclusion that essential fairness simply does not mandate reversal of Judge Sand's decision as an abuse of discretion.

## CONCLUSION

In light of the foregoing, the judgment of the district court is affirmed.