DAVID J. JOSEPH CO.,
Plaintiff–Appellee,

v.

M/V BALTIC, her engines, boilers,
etc., in rem, Defendant,

Bana Shipping Corp., in personam and
SMT Shipmanagement & Transport
Limited, in personam, Defendants–Appellants.

No. 01–9458.

United States Court of Appeals,
Second Circuit.

April 17, 2003.

Keith B. Dalen, Hill Rivkins & Hayden, LLP, New York, New York, for Plaintiff–Appellee.

Vincent M. De Orchis, De Orchis & Partners, LLP, New York, New York, for Defendants–Appellants.

Present: POOLER, SACK, and B.D. PARKER, Circuit Judges.

SUMMARY ORDER

THIS SUMMARY ORDER WILL NOT BE PUBLISHED IN THE FEDERAL REPORTER AND MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY TO THIS OR ANY OTHER COURT, BUT MAY BE CALLED TO THE ATTENTION OF THIS OR ANY OTHER COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA.

At a stated Term of the United States Court of Appeals for the Second Circuit, held at the United States Courthouse, Foley Square, in the City of New York, on the 17th day of April, two thousand and three.

ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that the judgment of the District Court be and it hereby is AFFIRMED.

In 1999, David J. Joseph Company ("Plaintiff–Appellee") purchased approximately 66,000 metric tons of hot briquette iron from Mitsui & Company ("Mitsui"). Plaintiff–Appellee contracted with SMT Shipmanagement & Transport Limited ("SMT") and Bana Shipping Corporation (collectively, "Defendants–Appellants") to transport the iron from Venezuela to the United States in three shipments. The parties entered into a charter, dated April 12, 1999, pursuant to which the M/V Arwa ("the Arwa") would transport the first shipment. The parties also agreed that Defendants–Appellants would transport the two other shipments under the same terms as the Arwa charter.

When the Arwa arrived at the loading terminal in Venezuela, the water was not deep enough to allow the parties to load

the full cargo onto the vessel while it was docked. Accordingly, Defendants–Appellants agreed to hire barges to ferry the remaining cargo to the Arwa while it was anchored in a deeper section of the river. In confirmation of the agreement, Defendants–Appellants sent an email to the charter broker stating in relevant part:

> We herewith confirm that barges used to top-off mv Arwa will be for Owners account/risk/time etc. gross negligence excepted. Barges can be loaded without any operational difficulty or safety problems. Capacity of barges are abt. 5000 mt. but reverting with dimensions of barges in due course.

The Arwa was loaded without incident, and the parties employed the same procedure with the second ship, the M/V Baltic ("the Baltic"). On February 5, 2000, one of the barges carrying cargo to the Baltic sank.

On August 4, 2000, Defendants–Appellants filed an action against Maritima Ordaz, C.A. ("Maritima"), which had provided the tug boat and barges, alleging that Maritima breached the terms of the agreement "by failing to provide a seaworthy barge." On August 24, 2000, Plaintiff–Appellee filed the instant action against Defendants–Appellants. Defendants–Appellants cross-moved to consolidate their suit against Maritima with the instant action, and Plaintiff–Appellee subsequently filed a separate complaint against Maritima. Prior to deciding whether to consolidate the three actions, the district court granted summary judgment in the instant case to Plaintiff–Appellee on the issue of liability. Defendants–Appellants now appeal that judgment.

■ At the outset, Defendants–Appellants argue that the district court erred by holding that the agreements to load the Arwa and the Baltic off-shore were mere clarifications of the parties' prior charter, which incorporated the Carriage of Goods by Sea Act, 46 U.S.C.App. § 1300 et seq. ("COGSA"). Defendants–Appellants argue that the loading agreements constituted separate contracts that were not subject to COGSA. In support of their argument, Defendants–Appellants cite only Mark Rensen's declaration, which asserts that "SMT's agreement to arrange for the barges was not part of the charter party contract, but a separate and distinct agreement which was outlined in my e-mail message to the charter broker ... dated January 17, 2000." However, Rensen's declaration does not provide adequate foundation to infer SMT's intent to form a distinct contract, as it does not state that he negotiated and executed the barging agreement on behalf of his company. Moreover, the declaration proffers no facts from which the trier of fact may determine the parties' intentions in forming the barging agreement. See *Western World Ins. Co. v. Stack Oil, Inc.*, 922 F.2d 118, 121 (2d Cir.1990) (recognizing that conclusory allegations are insufficient to create a triable issue). In the absence of admissible extrinsic evidence concerning the parties' intentions, resolving ambiguity over the construction of a contract is a question of law. *Seiden Assocs., Inc. v. ANC Holdings, Inc.*, 959 F.2d 425, 429 (2d Cir.1992) (citing *Antilles Steamship Co., Ltd. v. Member of the American Hull Ins. Syndicate*, 733 F.2d 195, 202 (2d Cir.1984) (Newman, J., concurring)).

Defendants–Appellants argue that the district court mischaracterized the email by finding that it "is best read as a clarification of the Charter Party, in light of apparently unforeseen circumstances, to provide a means of performing [Defendants–Appellants'] obligations under the Charter Party." Defendants–Appellants argue that the district court erred because Plaintiff–Appellee, and not Defendants–Appellants, had the obligation to provide a

safe berth for the vessel. However, the district court's conclusion does not reference the obligation to provide a safe berth. Rather, the district court's conclusion references the carrier's responsibility to "accept[ ] all of the agreed cargo." The shipping agreement provided that Defendants–Appellants would receive the cargo at Palua, and the district court correctly concluded that the email clarified this obligation.

■ Defendants–Appellants also argue that the email creates a genuine issue of material fact, even if it does not constitute a separate contract. Although Defendants–Appellants concede that they "agreed to accept the risk of loss of time involved in the topping-off operation as well as the risk of loss of cargo from the barges," they argue that they refused to accept the risk associated with any "gross negligence" on the part of the barge operator or loader, because they had no control over the operation of the barges. Accordingly, Defendants–Appellants argue that the email is ambiguous in its definition of "gross negligence" and that the email creates a triable issue whether they are liable, as the barge may have sunk due to the gross negligence of the operator or loader. However, neither of these arguments is relevant, as the district court correctly concluded that COGSA supersedes the disclaimer of liability in the event of "gross negligence."

In the instant case, the parties' shipping agreement provided that it would be "subject to the provisions of the Carriage of Goods by Sea Act of the United States." COGSA provides that a carrier of goods in international commerce "shall properly and carefully load, handle, stow, carry, keep, care for, and discharge the goods carried." 46 U.S.C. § 1303(2). Moreover, COGSA imposed a duty of care upon Defendants–Appellants when they accepted the goods for transportation and thereafter exercised control over them. *See Mackey v. United States*, 197 F.2d 241, 243–44 (2d Cir.1952) (Swan, C.J.). In *Mackey*, the shipper instructed longshoremen to load the cargo onto the ship from lighters that were moored alongside the vessel. A storm ensued, destroying some of the cargo, and the Court held that the shipper was liable because "[w]hen the lighters were moored alongside according to instructions issued by the ship and loading was commenced, the cargo was accepted for transportation and was thereafter subject to the ship's control...." *Id.* at 243.

Defendants–Appellants accepted most of the Baltic's cargo after it was loaded upon the vessel from the dock. Defendants–Appellants accepted the remaining cargo bound for the Baltic, including the portion of the shipment that was lost, once it was loaded upon the barges. Thus, Defendants–Appellants were bound by the duty of care imposed by COGSA because "the shipment ha[d] been delivered and accepted by the carrier." *Id.* "Here, by undertaking to provide barges to transport the cargo to the BALTIC, at its risk and expense, [Defendants–Appellants] unquestionably accepted the shipment when the cargo was delivered to the barge." District Court's Order at 12. The mere fact that there was no bill of lading for the lost cargo is not relevant because "[w]hile the giving of such documents is important evidence that the custody of the goods has been taken by the carrier, it is neither essential nor conclusive, provided in fact the shipment has been delivered and accepted by the carrier." *Mackey*, 197 F.2d at 243. Defendants–Appellants attempt to argue that "the obligation to get the cargo onto the vessel was on [Plaintiff–Appellee]." However, Defendants–Appellants expressly assumed this obligation, along

with the accompanying risk, when they accepted delivery of the goods.

█ Defendants–Appellants argue that, pursuant to Plaintiff–Appellee's agreement with Mitsui, Plaintiff–Appellee never assumed the risk of the cargo's loss, because the lost cargo had not yet been loaded on board the Baltic. However, Defendants–Appellants misconstrue the "free on board" provision of Plaintiff–Appellee's agreement with Mitsui. "F.O.B. or Free on Board means that title to the property passes from the seller to buyer at the designated FOB point." *Berisford Metals Corp. v. S/S Salvador*, 779 F.2d 841, 843 n. 2 (2d Cir.1985). Contrary to Defendants–Appellants' argument, the vessel itself was *not* designated as the "FOB point," in which case "title to the goods [would have] pass[ed] when the goods were loaded on board the ship." *Id.* Rather, the parties' email confirmation of their agreement provided that the goods would be "FOB Venezuela." Accordingly, Plaintiff–Appellee became responsible for the cargo once Defendants–Appellants accepted delivery in Venezuela. *See* U.C.C. § 2–503 (2002).

█ Upon concluding that COGSA applied to the shipping agreement and governed Defendants–Appellants' duty of care upon receiving the cargo, the district court correctly concluded that the clause of the email exempting Defendants–Appellants from liability in the event of "gross negligence" in connection with the barges was not binding. This Court has held that where COGSA has been incorporated into a contract, its provisions "supersede any conflicting provisions" in the parties' agreement. *Binladen BSB Landscaping v. M/V Nedlloyd Rotterdam*, 759 F.2d 1006, 1017 n. 12 (2d Cir.1985). Moreover, this Court has held that parties cannot by private agreement circumvent the terms or legislative purpose of COGSA. *Associated Metals & Minerals Corp. v. M/V Arktis*

*Sky*, 978 F.2d 47, 49–52 (2d Cir.1992). "[T]he purpose of COGSA is to place primary responsibility for the safety of the cargo upon the vessel, its operators and owners." *Id.* at 52. Specifically, "[a]ny clause, covenant, or agreement in a contract of carriage relieving the carrier or the ship from liability for loss or damage to or in connection with the goods arising from negligence, fault, or failure in the duties and obligations in [COGSA], or lessening such liability otherwise than as provided in this chapter, shall be null and void and of no effect." 46 U.S.C.App. § 1303(8). Accordingly, the district court properly disregarded the "gross negligence" clause at issue.

█ Finally, Defendants–Appellants argue that the district court overlooked the safe berth clause and improperly found that they had been negligent. However, there is no evidence that Plaintiff–Appellee breached its obligation to provide a safe berth. Moreover, contrary to Defendants–Appellants' allegation, the district court did not affirmatively find that Defendants–Appellants were negligent in hiring the barge that ultimately sank. Rather, the district court concluded that since Defendants–Appellants had an obligation "to assure the seaworthiness of the barges [they] supplied," any negligence alleged by Defendants–Appellants against Maritima in providing an unseaworthy barge would, in fact, be attributable to Defendants–Appellants themselves.

Based upon the foregoing, the judgment of the United States District Court for the Southern District of New York is AFFIRMED.